Spear, J.
The length of the bond of June 1, 1896, and of the several applications and continuation certificates then and thereafter given, introduced as exhibits, render it impracticable to reproduce them here in haec verba, but their salient features will be referred to. By the terms of the bond certain answers and representations and promises, and any subsequent representations and promises of the Loan Company, were made the basis of the contract denominated the bond, the language being that it is “understood and agreed that those representations and such promises, and any subsequent representations or promises of the employer, hereafter required by or lodged with the Company, shall constitute- part of the basis and consideration of the contract hereinafter expressed.”
The loss insured against was such as might be *258 sustained by reason of the ,fraud or dishonesty of • the employe “in connection with his duties as specified on said schedule ¿mounting to embezzlement or larceny,” and the time limit as to liability for such dishonesty was twelve months next before the discovery.
Respecting the promises referred to, the bond provided this: “This bond is entere^ into on the condition that the business of' the employer shall be continued to be conducted. and the duties and remuneration of the employes shall remain in accordance with the statements hereinbefore referred to.”
As qualifying the above it was also provided in the bond that the Loan Company should have the right, on giving written notice, to make interchanges or substitutions as to employes upon terms mentioned An the bond. Respecting this feature the further provision is,: “And the ’Company shall not be liable for other than the personal acts of the employe' within the direct scope of his duties named in said schedule or in said notices.”
Desiring to substitute another person as secretary, the Loan Company made written application January 25, 1897, and in that paper defined the duties of that officer thus: “Receive and deposit all moneys received by the Company and acting as secretary in general, having custody of cash, likely not more than $1,500, and of that only about twenty-four hours. .Not authorized to pay out cash op account, but required to make deposit in the authorized depository, The National •Park bank. Allowed, in conjunction with the 'president and treasurer, to indorse checks, but for deposit only,'and not authorized to sign checks *259 ñor accept drafts.” The representations respecting the powers and duties of the secretary were not subsequently changed. This application con-, tained the agreement that the answers were to be taken as conditions precedent, and as the basis of the bond.
At the expiration of the year, viz.: June 1, 1897, application in writing was made by the Loan' Company for a renewal and the - Company certified-that each of its employes named in the accompanying list had faithfully and satisfactorily performed his duties and promptly and correctly rendered his accounts during the preceding year, In this application Blodt, the defaulting employe, is classed as general manager and the obligation as to him is five thousand dollars.
Again, at the expiration of the year, application was made for a renewal and in that application Blodt was named as secretary with the same amount as guarantee. The same certificate as to faithful performance of duties as in the one preceding accompanied this application. ■
Like application, with like certificate as to performance of duties, was made in each of the three years following, Blodt being continued as secretary. He resigned August 8, 1901, and then the crash came.
The obligatory portion of the last continuation certificate was in form following:
“In consideration of the sum of one hundred and fifteen and 00-100 dollars, the Fidelity and Deposit Company of Maryland hereby continues in force schedule bond No. 175, in favor of The Guarantee Savings and Loan Company, Cleveland, Ohio, on behalf of the persons named in the *260 annexed schedule, in the positions and for the sums therein specified, for the period beginning the first day of June, 1901, and ending the 'first day of June, 1902, subject to all the covenants and conditions set forth and expressed in said schedule bond, heretofore issued on the first day of June, 1896.
“Provided the aggregate liability of the Fidelity and Deposit Company of Maryland, from the date of the issuance of said original schedule bond, to the date of the expiration of this certificate, for or on account of any act or acts of any one of said persons, shall not exceed the sum written opposite that person’s name upon the attached schedule.
“Witness the signatures of the president and secretary this fifth day of June, 1901.”
In the schedule attached to the application for this certificate Blodt was again named as secretary, and the sum written opposite his name was ten thousand dollars.
Blodt’s scheme of fraud was substantially this: Pie would purchase a cheap vacant lot taking title in the name of a fictitious person, and then cause an application to the Loan Company for a loan to be made on one of its blanks in the name of the fictitious person, accompanied by a deed and abstract of title.- The loan was to be used for the apparent purpose of erecting a building on the lot payable as the structure progressed. The borrower was described as a German, unacquainted with the English language, and for that reason wished Blodt to act for him. From time to time checks were thus secured in the name of the borrower, which Blodt would use in procuring the *261 money, acting on his pretended authority to represent the borrower, and forging the name of the fictitious payee, at the same time lodging with the Company a fraudulent insurance policy, he being an insurance agent. This simple scheme was made possible of accomplishment by the neglect of the other officers of the Company. No board of directors, nor any committee, acted upon these loans or the checks. Nor did any appraisal or other committee inspect these imaginary buildings, or the lots on which it was represented they were to be constructed. In no instance had any such building a real existence. Checks drawn by officers who were authorized to sign checks were signed up in blank and left in the custody of Blodt, the signers being absent, one of them continuously absent from the state. The money of the Company instead of being deposited wholly in the authorized depository, the Park bank, as the agreement required, was distributed around in several banking institutions, and the manipulation of the funds by Blodt thus made easier. Blodt’s fraudulent scheme commenced by an application presented October 12, 1896, by which he secured $800, and continued through all the years until August 7, 1901, the number of such fictitious applications reaching 129, the amounts ranging from' $150 to $1,620, and amounting in the aggregate to $209,100.
Nor were examinations made of Blodt’s accounts within the spirit of the contract June 1, 1900, nor in the year 1901. It appears that one Diehm made some examination prior to June 1, 1900, and that an alleged expert examiner, employed by the Company but directed by Blodt, *262 made an examination shortly prior to December, 1900, and reported the accounts correct. No accounts were in fact rendered, nor examinations had June 1, 1900, as stated in the Loan Company’s last certificate. And it is entirely apparent that the examinations which were made, although probably conducted in good faith, were really surface and perfunctory examinations, and entirely untrustworthy. It is equally apparent that had the Company exercised ordinary diligence, or a real effort to comply with its contract with the Fidelity Company, the criminally loose methods of Blodt and the grossly negligent methods of the other officers having duties in the management to perform,- and which the spirit of the-contract with the defendant Company required that they should perform, would have been exposed years before the final catastrophe, and before the certificate on which liability is claimed by plaintiffs was issued. In fact, the active management appears to have been turned over to Blodt, who conducted affairs as he pleased without control, check, or efficient supervision by anyone. Much of the time the vice-president was out of the state, he and the treasurer. having signed and left with Blodt blank checks, and all of the amounts he converted were obtained by using* these checks. The other officers seem to have been equally negligent. The vigilant supervision which the Company, as well by its by-laws, the statutes of the state, and its contract with defendant, was required to exercise, was wholly wanting.
The certificate for continuation accompanying the last application is in the terms following:
“Certificate. — I, Arthur L. Mix, Prest. Guaran *263 tee Savings and Loan Co., hereby certify that each of the employes named in the accompanying list has faithfully and satisfactorily performed his duties and promptly and correctly rendered his accounts during the year ending June 1st, 1901; and that to the best of my knowledge and belief, neither of them has been, nor is now, in arrears or default; that at the-date of the last examination of their respective accounts the same wfere found, in each case, correct, and I know of no reason why the guarantee on behalf of each should not be continued.'
“Dated at Cleveland, O., June 1st, 1901.
■“(Signed) Arthur L. Mix, Prest,
“The Guarantee Savings and Loan Co.”
Two questions only seem to need attention. What is the* nature, and the effect in law, of the representations and promises made by the Loan. Company to the Fidelity Company to induce the. bonding contract, and were the defaults of Blodt “within the direct scope of his duties named in said schedule,” that is, his duties as secretary?
1. As to the first question. It is assumed that the bonding contract, with the continuation certificates, are in the nature of insurance contracts rather than surety contracts, and it is contended that the effect of the statements denominated representations and promises are not to be treated as warranties, but are merely representations, and to be determined by the rules applicable to insurance contracts. That is, unless the statements are known to be untrue when made, their actual falsity does not prejudice the rights of the insured. An extensive array of authorities is produced to show that the language of such contracts should be *264 construed most strongly against the insurer, since the terms are specified by the company and not by the policy-holder. It is perhaps not necessary to look beyond our own state to ascertain the correct rule. Being contracts of indemnity against loss such contracts should be liberally construed in favor of the object sought to be attained, and where a clause is susceptible of two interpretations which seem equally fair, that should be preferred which affords the greater indemnity, but, like other contracts, they should receive a reasonable construction in order to carry out the "presumed intention of the parties as expressed by the language used. West et al. v. Ins. Co., 27 Ohio St., 1; Travelers’ Ins. Co. v. Myers & Co., 62 Ohio St., 529; Germania Fire Ins Co. v. Schild, 69 Ohio St., 136. The question of what name shall be given to the representations and promises of the Loan Company seems to us unimportant. The certificate of Mix, the president, attested positively that each of the employes, which included Blodt, had “faithfully and satisfactorily performed his duties and correctly rendered his' accounts during the year ending June 1, 1901,” and at the date of the last examination of the respective accounts the same were found in each case correct, both of which statements also included the treasurer, Wunderlich. These statements, relating as they did to past transactions and existing conditions, and the promises as to future conduct of employes, entered into the contract and were at least in part the inducement which led to it, and constituted the basis of liability on the part of the Fidelity Company, and, although the term warranty is not used, yet they in law had the full effect of *265 warranties. So that their falsity in any material particular is fatal to any action on the bond. That the statements were both false and material admits of no rational dispute. That Mix, the president, had no personal knowledge of their falsity is immaterial. They were the representations of the Company, and that they were grossly false was well known to those who were in active management of the Company’s affairs. This- condition brings the case within the ruling in Orme & Okey, Recrs., v. Baker, 74 Ohio St., 337, where the knowledge of those actively participating in the management of a bank is held to be in law the knowledge of. the bank itself. But proof of such knowledge is not essential to the responsibility of the Company for the truth of the statements made. The statements were conditional to the taking effect of the stipulation for liability on the part of the Fidelity Company; were statements that certain facts were true, and that certain acts respecting the performance of duties should thereafter be done by officers of the Loan Company. These statements, however expressed, are of the very essence, of warranties. The promises were to be observed in good faith; the representations as to the conduct of the employes and.the condition of their accounts and transactions with the Company could not be' truthfully made unless they were the result of a reasonably vigilant examination and supervision of the conduct of such employes and their dealings which affected the .business of the Company. As before stated, no real effort to control or supervise Blodt was attempted, and he was allowed practically to manage the whole affair to suit himself. ..The *266 duties' of other officers were defined in the- Company’s statements accompanying their several applications, and it was part of the contract • that these, duties should not be changed without notice to the Fidelity Company. No such notice was given. On the contrary, the last statement of the president implies that the concerns are being ■managed by the several officers in accordance with the previous stipulation. It does more than this. We emphasize the fact that it contains a positive statement that each of the employes named has faithfully and satisfactorily performed his duties. In fact, some had utterly abandoned their duties. It stated' positively that they had promptly and correctly rendered accounts during the year ending june 1, 1901. Some' of them had rendered no accounts whatever during that year. The examination of the alleged expert was made, the ■December before. The foregoing are positive statements. The -certificate does say that to the best of the president’s knowledge and belief neither of. the employes had beén or was ■ in arrears or default. At the trial, Mix, the president, was absent from the state and could not be produced In person. He seems to have been generally absent so far as the performance of duties was concerned. It was stipulated by counsel that if present he would testify that he executed the certificates signed by him and had no knowledge of the untruthfulness of any matter therein contained. Very likely. But his certificate was the certificate •'of the Company as regards the rights and obligations of the Fidelity Company, and his personal belief, entertained in a distant state, and with no previous intelligent effort on his part to ascertain *267 the truthfulness of the statements, when taken with the real facts as they existed, shows not only a failure on the part of the Company to perform its part of the contract, but a blind, reckless disregard of contract obligations. Can any intelligent person suppose that if the method of management had been disclosed as fully as it was concealed, that the 'bond would ever have been renewed by the defendant Company? We think not. It appears to us clear that the representations and promises were in law warranties, and the falsity of the former and the disregard by the Loan Company of the latter constitute a complete defense.
■ Lest the foregoing comment respecting the negligence-of the Loan Company be misconstrued as indicating that negligence is the basis of our judgment, we add that negligence is but an incident. It is not intended to hold that mere negligence on the part of the guarantee may afford a defense but to hold that a warranty binds the warrantor, and that. tfye breach on his part constitutes a defense to an action on the bond.
2. But were the defaults of Blodt, ■ whether to be regarded as embezzlements or larcenies or by whatever name denominated, within the line of his duties as secretary? Those duties, so far as the money of the Company is concerned, are specifically defined. The secretary is authorized to receive money and it is his duty to deposit it. This specification as to deposit of funds by the secretary is in conflict with sections four and five of the by-laws, which provide that the secretary “shall receive all moneys paid to the company and enter the same in the proper books,” and that “the *268 treasurer shall receive and have custody of all the moneys of the Company and promptly depo’sit the same in such bank or banks as the board of directors may designate,” thus implying that the secretary should pay moneys received to the treasurer. But whichever shall be taken as the controlling provision regarding deposits of money it is entirely clear that nowhere is authority given the secretary to withdraw the funds, and that so far as the money was concerned his duty had been exhausted when he properly deposited it. It is provided by section 3836-4, Revised Statutes, that the treasurer shall deposit all funds in the bank designated by the board of directors, and they can be withdrawn only by check signed by the president and financial secretary, or such other, officers as the board of directors may designate. In making deposits of funds received by him Blodt was acting as secretary, but the fact that t|ie signature of the secretary to checks is contemplated by the above cited statute does not suggest that he has authority to use the checks; the contrary inference is apparent. Nor had he any duty as secretary to pass upon applications for loans, nor perform the duties of an appraisal committee in the examination of the securities offered, nor the duty of - the board of directors in authorizing expenditures. All-these acts, while necessary in the working out of Blodt’s fraudulent scheme, were not only not within the direct scope of his duties but were wholly without any of the 'specified duties. The frauds upon the Company to which these transactions were incidents, were not, therefore, the frauds of Blodt as secretary, but were acts which, by the gross negligence of the Com *269 pany, he was permitted to do foreign to the duties enjoined upon him by the schedule as well as the statute and the by-laws of the Company. Let us recur again to the provision of the bond. The Fidelity Company is to make good to the Loan Company any loss sustained by reason of the fraud or dishonesty of the employe “in connection with his duties as specified on said schedule,” and “the Company shall not be liable for other than the personal acts of the employes within the direct scope of their duties named in said schedule.” These-are controlling provisions. If we are right in these deductions from them and from the facts of the record, and they seem inevitable, then it follows that Blodt’s frauds do not come within the direct scope of his duties as secretary, and that, therefore, they are without the obligation of the bond and the Fidelity Company can not be held for them.
We find no error in the judgment of the circuit court or in that of the common pleas, and they will be

Affirmed.

Shauck, C. J., Price, Crew and Summers, jj., concur. .